IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

KREAGER V. KREAGER

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

HEATHER A. KREAGER, APPELLEE AND CROSS-APPELLANT,

V.

AARON W. KREAGER, APPELLANT AND CROSS-APPELLEE.

Filed January 14, 2025.    No. A-23-992.

Appeal from the District Court for Sarpy County: STEFANIE A. MARTINEZ, Judge. Affirmed in part, and in part reversed and remanded.

Matthew Stuart Higgins, of Higgins Law, for appellant.

Philip B. Katz and John Andrew McWilliams, of Gross, Welch, Marks & Clare, P.C., L.L.O., for appellee.

RIEDMANN, Chief Judge, and MOORE and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Aaron W. Kreager appeals, and Heather A. Kreager cross-appeals from the Sarpy County District Court's order dissolving their marriage, awarding custody, calculating child support, and dividing the marital estate. For the reasons stated herein, we affirm in part and reverse and remand in part.

## II. STATEMENT OF FACTS

### 1. BACKGROUND

The parties were married in August 2003 and had two children during the marriage: Braden, born in 2010, and Ronan, born in 2013. When the parties first married, Aaron worked while Heather attended school pursuing a veterinary degree. Heather graduated in 2007, and

- 1 -

shortly thereafter, the parties relocated to Florida where Heather accepted a job as a veterinarian. During that time, Aaron worked as a golf caddy and at a liquor store until he accepted an executive position with the Boy Scouts of America.

In 2012, the parties moved to Nebraska and purchased the marital home. Aaron transferred his position with Boy Scouts of America from Florida to Nebraska. After settling in Nebraska, the parties opened their own veterinary hospital, The Chalco Hills Animal Hospital. Aaron subsequently left his job with Boy Scouts of America and in 2014, Aaron took a job with Triage Staffing until he was let go in April 2019 due to poor performance. Sometime thereafter, Aaron stole a euthanasia agent from the veterinary hospital. When Aaron threatened to use the euthanasia agent on himself, Heather contacted the police. The police arrested Aaron and thereafter, he was hospitalized and diagnosed with Major Depressive Disorder. While Aaron was in jail and/or the hospital in May 2019, the parties separated, and Heather moved out of the parties' marital home.

## 2. COMPLAINT AND COUNTERCOMPLAINT

In May 2019, Heather filed a complaint for dissolution of the parties' marriage that requested sole legal and physical custody of the parties' children subject to Aaron's parenting time, child support, and an equitable division of the parties' marital estate. Heather further filed a motion requesting the court to enter temporary orders for custody, visitation, and child support. Aaron's answer and cross-complaint requested, inter alia, joint legal and physical custody of the parties' children, child support, and an allocation of the children's expenses, temporary and permanent alimony, exclusive possession of the marital home, and attorney fees. That same day, Aaron filed a motion for temporary orders which, as amended, requested, inter alia, that the court enter an order requiring Heather to: produce an inventory of all household goods and furnishings she removed or destroyed from the marital home; maintain health insurance coverage for Aaron; and provide him with a monthly accounting of the marital business.

## 3. TEMPORARY ORDERS

Pursuant to the parties' agreement, the court entered partial temporary orders awarding the parties joint legal and physical custody; awarding Aaron exclusive possession of the marital residence and providing that he was solely responsible for the regular expenses related to the residence; awarding Heather exclusive possession of the marital business and restraining Aaron from entering the clinic without prior written consent; and requiring Heather to produce an inventory of the household goods and furnishings she removed and/or destroyed from the marital residence.

Following a hearing on the remaining issues in the parties' motions for temporary orders, on August 12, 2019, the court entered a further temporary order, which among other things, determined that for the purpose of calculating child support, Heather's monthly income was assessed at $14,593.50 based on an accountant's valuation of the business in 2018 and assessed Aaron's monthly income at an earning capacity of $5,000 which was the average of his last known salary range; ordered the parties to pay their pro rata share for child expenses; ordered Heather to attempt to add Aaron on her health insurance coverage; ordered Heather to pay the monthly mortgage on the marital home; denied Aaron's request for alimony; ordered the parties to pay their

own attorney fees; found that Heather was entitled to a credit for the increased cost for her to maintain the children on her health insurance; ordered Heather to pay $625 per month in child support; denied Aaron's request for attorney fees; and denied any and all other relief requested and not addressed.

## 4. DISCOVERY ISSUES

While the matter was pending, multiple issues with discovery arose. Following the withdrawal of Heather's counsel, Heather retained a new attorney, and the discovery issues were resolved.

## 5. TRIAL

Trial was held over 3 days in August and September 2022. Testimony was adduced from the parties; W. Bruce Wilkie, a residential appraiser; Brad Yoder, a certified public accountant; William Kenedy, a certified public accountant and business valuation expert; Brandon Raddish, Aaron's prior employer; and Matthew Stadler, a business valuation expert. The court received numerous exhibits including the parties' joint property statement, their mediated parenting plan, proposed child support calculations, tax returns, business valuations, bank records, student loan statements, and discovery responses.

### (a) Testimony of Parties

Both Heather and Aaron testified that the parties met while pursuing their undergraduate degrees in Minnesota and subsequently married in 2003. Shortly after their marriage, Heather began pursuing a veterinarian degree and worked part-time while Aaron worked full-time. After Heather graduated in 2007, the parties moved to Florida after she accepted a position as a veterinarian. During that time, Heather testified that Aaron was initially unemployed until he accepted a position as a golf caddy and then later accepted employment at a liquor store. After Aaron was terminated from the position at the liquor store, he accepted a position with Boy Scouts of America. In 2010, the parties' first child was born.

In November 2012, after the parties agreed that they did not want to raise their family in Florida, they moved to Nebraska and subsequently purchased a home. At that time, Aaron transferred his position with the Boy Scouts of America in Florida to Nebraska. Aaron worked full-time with Boy Scouts until he was terminated from the position. Thereafter, he began working at Triage Medical Staffing.

In February 2013, the parties opened the Chalco Hills Animal Hospital. Heather testified that although Aaron had substantial involvement in the creation and establishment of the hospital, he was not involved in any day-to-day operations and did not act as an office manager. Both Heather and Aaron testified that Aaron maintained his employment with Triage Medical Staffing until he was terminated for poor performance in April 2019. The following month, Aaron was arrested and put on a 10-day psychiatric hold after he came into the veterinary hospital, stole a euthanasia solution, and threatened to kill himself. Heather testified that she filed for divorce while he was in the psychiatric hospital. Heather testified that after Aaron was released from the hospital, he transferred $13,000 from the parties' joint savings account and $6,000 from the parties' joint

checking account, into two of his own separately owned accounts. Aaron acknowledged transferring the funds into his personal accounts.

### (b) Testimony Regarding Student Loan Debt

The parties both testified that Heather incurred student loan debt during the parties' marriage. Heather testified that the total loan was approximately $147,000, that $83,330.51 was applied to tuition and fees, and that the remaining $64,923.49 was deposited into the parties' joint checking account over the course of 4 years and was used to cover living expenses. Heather testified that during a portion of time she was in school, Aaron took a job for 18 months in Omaha, Nebraska, and that the parties utilized funds from her student loans to cover living expenses for maintaining two separate households. Aaron testified that he knew that $64,000 was deposited in the parties' joint bank account, that he had a general idea of what happened to the money, but that he "couldn't speak with any specificity" as to how it was spent. He testified that

> I know that when the money came from the Department of Education, when the loan money would come in, it would go into our joint account. I allowed, you know, [Heather] and . . . I trusted her implicitly.
>
> . . . .
>
> But she managed the checkbook in our house, and so if she felt like she needed to write a check for something or purchase something, she would. But into that same account went every one of my paychecks. And so the money . . . was all dumped into one bucket. So I couldn't tell you what was poured out of the bucket that I earned versus what was poured out of the loan.

Aaron testified that some of the funds were used for "a new laptop computer that was purchased for. . . school," that "when we were living apart and I was working down here in Omaha, . . . we had to find furnishings for an apartment that she was living in," that she used it to buy clothes, and that Heather "used it to live on. . ." Aaron testified that $64,923 was used for living expenses and personal expenses.

### (c) Calculation of Income and Taxes

Brad Yoder testified that he was the tax professional for Heather and the business since 2019. He testified that the veterinary hospital was a limited liability company, but that it was taxed as a partnership with Heather as a 51 percent owner and Aaron as a 49 percent owner. Yoder testified to how the parties' incomes were determined for tax purposes, how the guaranteed payments were calculated, how Heather's income was determined, the liabilities of the business and depreciation schedules, and how Heather's health insurance was paid.

William Kennedy, a certified public accountant and business valuation expert, testified about Heather's income and how to calculate Heather's income to avoid "double dipping." Kennedy testified that he calculated Heather's income at $363,000 by utilizing schedule 1 of her tax return which included the business's cash flow to determine income. He testified "[t]hat would be using the cash flow from the business to determine the value of the business for property settlement purposes and then using that same income for purposes of determining alimony and

child support. That's, to me, the classic double-dip." However, Yoder testified that Heather's salary was the functional equivalent of what the tax return refers to as guaranteed payments and that the other income is pass-through income of the business attributed to her. He stated that Heather's income on her tax return

> comes from. . . Page 14, there is two different lines from Chalco Hills. The first line shows the income from the business that passes through to her, which is pass-through income. It doesn't necessarily mean that you receive it. It's attributed to you. And then line 28B is the guaranteed payment portion, the 95,348, that's more closely related to your question about what her salary is.

### (d) Business Valuation Testimony

William Kennedy and Matthew Stadler, business valuation experts, both testified to the value of the business. Both Kennedy and Stadler testified that they used the same income-based method for determining the value of the business. The experts both agreed that their valuations, assumptions, and approach, were similar and that the main difference between the valuations was the date on which the business was valued. Kennedy testified that he valued that business as of May 15, 2019, whereas Stadler testified that he valued the business as of December 2019 and then later updated his report as of December 2021. Both experts acknowledged that the difference in the values was attributable to the different valuation dates and was a result of Heather paying down the business' liabilities during that period. Kennedy testified that the amount of the loan at the time he valued the business was $624,000, whereas the debt 2 years later at the time of the Stadler's report was $231,049.

### 6. POSTTRIAL CONFERENCE AND DECREE

A posttrial conference was held on October 25, 2022, and the record remained open for additional evidence. Additional evidence was offered and received on December 12. Although the district court held a hearing on May 14, 2023, during which it orally announced its rulings, the dissolution decree was not finalized until November 6, 2023. The decree determined that the parties' marriage was irretrievably broken, awarded the parties joint legal and physical custody of the children, approved the parties' mediated parenting plan, determined child support, denied requests for alimony or attorney fees, divided the parties' marital property and debts, and awarded Aaron an equalization payment.

### III. ASSIGNMENTS OF ERROR

Aaron assigns, renumbered and restated, that the district court erred: (1) in classifying $64,923 of Heather's student loan debt as marital; (2) failing to classify a medical bill incurred during the marriage as marital debt; (3) valuing the marital business as of the date of the parties' separation; (4) failing to award him income distribution and profits from the marital business from the time of the filing; (5) failing to award him alimony; (6) failing to award him attorney fees; (7) failing to adopt his proposed amendment to the parenting plan which Heather agreed to; (8)

providing Heather a credit for health insurance in calculating child support; and (9) failing to award him a retroactive child support adjustment based on Heather's actual income.

Heather cross-appeals assigning that the district court erred in determining her annual income for child support purposes was $337,956.

## IV. STANDARD OF REVIEW

In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Radmanesh v. Radmanesh*, 315 Neb. 393, 996 N.W.2d 592 (2023). This standard of review applies to the trial court's determinations of alimony and property division. *Id*. In a review de novo on the record, an appellate court is required to make independent factual determinations based upon the record, and the court reaches its own independent conclusions with respect to the matters at issue. *Id*. When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Id*.

A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id*.

## V. ANALYSIS

Before addressing Aaron's assigned errors, we first revisit the law related to the division of marital property.

In a marital dissolution action, the equitable division of property is a three-step process. *Parde v. Parde*, 313 Neb. 779, 986 N.W.2d 504 (2023). The first step is to classify the parties' property as either marital or nonmarital, setting aside the nonmarital property or nonmarital portion of the property to the party who brought the property to the marriage. *Id.* The second step is to value the marital assets and marital liabilities of the parties. *Id.* And the third step is to calculate and divide the net marital estate equitably between the parties. *Id*.

As a general rule, all property accumulated and acquired by either party during the marriage is part of the marital estate, unless it falls within an exception to the general rule. *Anderson v. Anderson*, 27 Neb. App. 547, 934 N.W.2d 497 (2019). The burden of proof to show that property is nonmarital remains with the person making the claim. *Id*. Generally, a spouse should be awarded one-third to one-half of the marital estate, the polestar being fairness and reasonableness as determined by the facts of each case. *Id.*

### 1. STUDENT LOAN DEBT

Aaron first contends that the district court erred in classifying $64,923 of Heather's student loan as marital property. Aaron argues that the evidence was insufficient to support the district court's determination that $64,923.49 of Heather's student loan debt was marital debt because there was no specific testimony or evidence that proved that any of the $64,923.49 was spent to support the family, there was no evidence of their family expenses, and there was no evidence of what amounts were paid towards those expenses.

Marital debt includes only those obligations incurred during the marriage for the joint benefit of the parties. *Wright v. Wright*, 29 Neb. App. 787, 961 N.W.2d 834 (2021). Three other cases provide guidance on the classification of student loans in dissolution cases: *Walker v. Walker*, 9 Neb. App. 694, 618 N.W.2d 465 (2000), *Wright v. Wright*, 29 Neb. App. 787, 961 N.W.2d 834 (2021), and *Macy v. Macy*, 32 Neb. App. 258, 995 N.W.2d 899 (2023).

In *Walker v. Walker, supra*, the record showed the wife had a student loan indebtedness of $63,800 which was approximately $20,000 more than the wife's educational expenses. This court held that the district court did not abuse its discretion in finding that student loan debt accrued during the parties' marriage was nonmarital where the parties disputed the extent to which the student loans were used for joint marital interests or the wife's education.

In *Wright v. Wright, supra*, the evidence established that shortly before the parties' marriage, the husband returned to school to obtain a master's degree. He took out student loans to pay for his school and testified that he borrowed an additional $41,000 to cover the parties' expenses which funds were deposited into the parties' joint account. In determining that there was insufficient evidence to classify any amount of the student loan debt as marital, the court noted that the evidence did not establish how much of the loans were used to pay for tuition, books, or other school expenses or to what extent the student loans had been used to support joint marital interests. Further, the record did not contain any accounting for how the student loan proceeds deposited into the parties' joint account were utilized during the marriage. This court affirmed the district court' decision finding that "[i]n the absence of further evidence and context regarding [the husband's] student loans, we cannot say the district court abused its discretion in not attributing any amount of [his] student loan debt to the marital estate." *Id*., 29 Neb. App. at 808, 961 N.W.2d at 849.

In *Macy v. Macy*, 32 Neb. App. 258, 995 N.W.2d 899 (2023), this court was again presented with an appeal of a dissolution of marriage in which the issue of the classification of student loans was at issue. In that case, the husband claimed that the district court erred in classifying $27,453 of the wife's student loans incurred during the parties' marriage as marital debt because the wife failed to provide any documentation showing that the loans were used for marital expenses including to pay off debt associated with the wife's wedding ring. The parties both acknowledged that the wife incurred student loans during the parties' marriage and that some of the funds were used for marital expenses, but the record was lacking concerning how the loan proceeds were actually spent. This court affirmed the decision of the district court finding:

> Similar to *Wright*, in the absence of further evidence and context governing the balance on the student loans, and in recognition of the fact that the burden belonged to [the husband] to show this debt incurred during the marriage was nonmarital, we cannot say the district court abused its discretion in attributing the debt as marital on the limited evidence presented on this topic.

*Macy v. Macy*, 32 Neb. App. at 269, 995 N.W.2d at 912.

Here, during the trial, Heather offered, and the court received, exhibit 37, which documented all disbursements on the loan; how the loan proceeds were utilized for tuition, books, and fees as opposed to living expenses; her total monthly payments on the loan; and its current

balance outstanding. The parties did not dispute that Heather pursued a veterinary degree shortly after the parties married; that a total of $147,254 was disbursed on the loan; that, over the course of the 4-year veterinary program, $64,923.49 was deposited into the parties' joint checking account; that the parties did not have any other separate or joint bank accounts at that time; and that the student loan provider determined that the cost of tuition and fees amounted to about $82,330.51 for the program.

Heather testified that the $64,923.49 of her student loans deposited into the parties' joint checking account was utilized to pay various living expenses of the parties during their marriage. Heather testified that at one point, the parties were paying for two separate households while Aaron was temporarily employed in Omaha and that a portion of her student loan funds were utilized to pay for rent, utilities, groceries, gas, and all "the normal things that you need to live." The parties both acknowledged that after Aaron lost his job in Omaha, he was unemployed for a period of time. Heather testified that she continued to cover the parties' living expenses during Aaron's period of unemployment. Aaron testified that, during their marriage, Heather primarily managed the parties' finances and he could not state with specificity how the student loan funds were spent after they were deposited into their joint checking account. However, Aaron testified that some of the funds were used for living expenses and for Heather's personal expenses including purchasing a new laptop for Heather, clothes, and apartment furnishings. Thus, although there was no specific documentation or receipts indicating what family expenses were paid with Heather's student loans, both parties acknowledged that, at least for a period of time, the money was used for living expenses for maintaining not one, but two separate households. Considering the parties' acknowledgement that the funds were used for the parties' living expenses, we cannot find that the district court abused its discretion in finding that a portion of Heather's student loans was marital. This assignment of error fails.

### 2. MEDICAL BILLS

Aaron's second claim is that the district court erred in classifying $24,742.49 of Aaron's medical bills, which were sent to a collection agency, as nonmarital debt. More specifically, the entirety of his assignment of error and argument provides that "[a] medical bill with Nebraska Medicine (at time of trial [an] 'Accredited Collection Services Inc.' bill) for medical care provided to Aaron during the marriage was improperly excluded from the Court's recoding of the marital estate. [Citations to record omitted.]" Brief for appellant at 41.

Here, the district court, in its order, listed the medical debt sent to a collection agency as "[Aaron's] debt incurred post-filing" and therefore, did not include it as marital debt. During the trial, Aaron did not provide any information pertaining to medical debt. However, Heather offered, and the court received, exhibit 38, which detailed Aaron's post-separation debts. Additionally, the parties stipulated to the admission of exhibit 139 which detailed debt owed by Aaron to Accredited Collection Services, Inc. on behalf of Nebraska Medicine, Bellevue, dated October 2019. The debt is included on the parties' joint property statement and listed as "Defendant's medical bills." Both parties acknowledge that Aaron was hospitalized for a week at the Adult Crisis Unit after stealing euthanasia medication from the clinic and making suicidal threats in May 2019 at the time Heather filed for divorce.

Aaron does not argue on appeal, nor did he provide any evidence to the district court related to this debt, when it was incurred, or whether each bill sent to collections was related to his May 2019 hospitalization. Because Aaron failed to present evidence to contradict Heather's assertion that the debt represented post-separation debt incurred by Aaron, we find that the district court did not err in classifying the medical bill sent to a collection agency as nonmarital.

### 3. VALUATION DATE

Aaron's third claim is that the district court erred in valuing the parties' business as of the date of the parties' separation. He argues that the district court should have valued the business based on his expert's 2021 valuation which was closest to the time of trial. More specifically, he contends that "[b]y valuing the business at the time of separation, the $305,500.00 awarded at the time of trial, robs Aaron of even the appreciation of simple interest on his portion." Brief for appellant at 36.

As a general principle, the date upon which a marital estate is valued should be rationally related to the property composing the marital estate. *White v. White*, 304 Neb. 945, 937 N.W.2d 838 (2020). The date of valuation is reviewed for an abuse of the trial court's discretion. *Rohde v. Rohde*, 303 Neb. 85, 927 N.W.2d 37 (2019).

Here, the district court's order provided:

[Heather's] expert witness, Bill Kennedy, testified regarding his May 19, 2019, valuation report for CHAH. [Aaron's] business valuation expert, Matthew Stadler, provided two reports, one valuing the business as of December 31, 2019, and one valuing it two years later on December 31, 2021.

The Court specifically finds that the business, CHAH, should be valued as closely to the parties' date of filing, which was May 15, 2019. The Court declines to grant [Aaron's] request that the business be valued as of December 31, 2021 - 2 1/2 years after the date of separation. The Court finds that the only significant difference between the valuation reports offered by [Heather] and [Aaron's] experts is the valuation date. Both experts testified that the various percentage rates used for assumptions and discounts underlying the reports were very close to one another, and that both experts' rates were within the range that is generally acceptable when doing business valuations of this type of business. The only other difference of any significance between the valuation reports of the expert witnesses was the valuation date being utilized as to the balance of the business improvement loan.

As a result of the foregoing, the Court finds that for purposes of valuing the marital estate, Chalco Hills Animal Hospital (CHAH) has a fair market value of $611,000 as of May 19, 2019.

During the trial, the parties each offered expert testimony as to the value of the veterinary clinic business. Both experts acknowledged using the same generally accepted income-based approach for valuing the business and both acknowledged that, apart from some minor differences in their key assumptions, the main difference between their values was valuation dates due to a reduction of liabilities. William Kenedy, Heather's expert valued the business at $611,000 as of

May 15, 2019, and Matthew Stadler, Aaron's expert valued the business at $789,000 in December 2019 and updated it to $941,000 as of December 2021. As it relates to the changes in the liabilities, it is undisputed that in 2017, the parties took out a business improvement loan for $822,000 and that Heather was paying $12,000 per month on that loan. At the time of Kenedy's report in May 2019, the balance of the loan was $624,000, whereas at the time of Stadler's December 2019 valuation, the debt had been reduced to $566,000. When Stadler updated his report to value the business as of 2021, the balance of the loan was $231,049.

Aaron does not explain why the court's valuation at the time of the parties' separation was not rationally related to the property, nor does he explain how his suggested date was more rationally related to the property than the one chosen by the court. See *White v. White*, 304 Neb. 945, 937 N.W.2d 838 (2020). Here, the evidence indicated that by the time of the parties' separation and Heather's filing for dissolution, the veterinary business was fully operated by Heather, who has continued to operate the business during the entirety of the separation up until the time of trial. Because we find that valuing the business that was solely operated by Heather as of the date of Heather's filing for dissolution was a rational determination by the court on this record, and because Aaron fails to offer any explanation as to how or why the later date provides a more rational approach, we find no abuse of discretion in the valuation date chose by the district court. See *Rohde v. Rohde*, 303 Neb. 85, 95, 927 N.W.2d 37, 46 (2019) ("The value at the date of filing was rationally related to . . . the business properties, because once the parties separated, these assets no longer benefited them both). This assignment of error fails.

### 4. DISTRIBUTION OF PROFITS

Aaron's fourth claim is that the district court erred in failing to award him income distributions and profits from the marital business from the time of the filing of the complaint for dissolution. Aaron contends that because the business tax return K-1's for tax years 2019, 2020, and 2021 continued to attribute taxable income to him for those years, for which he was required to pay taxes, he was entitled to income distributions for that same period.

The district court denied Aaron's request for reimbursement of the business' income and profits for years 2019, 2020, and 2021. Instead, the court required Heather to pay all tax consequences associated with taxable business income for those years attributable to Aaron as indicated on the final equalization schedule. Aaron argues this was an abuse of the court's discretion. We disagree.

It is undisputed that Aaron had a 49 percent interest and Heather had a 51 percent interest in the business. Matthew Stadler testified that the tax documents should be filed based on each partner's ownership interest according to the operating agreement. Although some of the tax documents did not initially do so, the tax returns were later amended to reflect each party's ownership interest. Aaron's expert, Stadler, explained how the income attributed to Aaron was determined:

So a partnership is a business, but . . . in a tax code theory, it is a collection of jars. In each one of those jars is a person. So [Aaron's] jar is here. [Heather's] jar is here. Let's say we have 50 partners, there's going to be 50 individual jars. . . . So what the K-1 is trying to accomplish is, . . . what should be in your jar?

. . . So to answer your question, the other basic theory of partnership tax is if we are talking a general partnership in which the partner is actively involved, the tax code definition of that is 750 hours or more in a calendar year. The income that they derived from the partnership is considered self-employment income, so it's therefore subjected to self-employment tax, which is . . . 12.4 percent for Social Security purposes, and 2.9 percent for Medicare.

So what that figure is, is that's not income. That figure is the sum total of Box 1 and Box 4. You can do the math, it will prove out. So what that . . . line is telling you is that . . . this amount is subject to self-employment tax.

. . . .

[I]f you're an active partner, the profits of that partnership are deemed to be your wage as far as partnership tax is concerned. . . . Both of them are ordinary income. Both of them are subject to . . .self-employment tax.

The difference between the two is that when we're going to figure out what the profit is of the partnership to be allocated to the partners, we subtract the guaranteed payments off and specifically allocate the guaranteed payment to who earned it. So once we subtract that guaranteed payment out, that results in the net income.

Although the parties were required to allocate income for tax purposes until the business' ownership structure was finally changed, it does not follow that the court was required to order a distribution of income or profits from the business for the same period. As we found before, the court did not abuse its discretion in valuing the business as of the date of Heather's filing for dissolution and it reasonably follows that profits generated by the business would likewise track with that valuation date pending the trial court's final property allocation and division. Further, as we explain more fully in the section of this opinion governing earnings and retained earnings of the company, it does not necessarily follow that income earned by a limited liability company must necessarily be distributed out to the entity's owner. Although Aaron remained responsible for taxes until the partnership structure changed, the court equitably resolved that obligation by requiring Heather to be responsible for the tax obligation relating to that period. We find no abuse of discretion associated with the court's resolution and reject Aaron's argument that he was entitled to profits for the applicable period.

### 5. ALIMONY

Aaron's fifth claim is that the district court abused its discretion in failing to award him alimony. He contends that when considering the factors in determining whether to award alimony to the facts of the case, it proves that the court's failure to award such alimony was "unreasonable, an abuse of discretion and patently unfair." Brief for appellant at 29.

In dividing property and considering alimony upon a dissolution of marriage, a court should consider four factors: (1) the circumstances of the parties, (2) the duration of the marriage, (3) the history of contributions to the marriage, and (4) the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of each party. *Seivert v. Alli*, 309 Neb. 246, 959 N.W.2d 777 (2021). In addition, a court should

consider the income and earning capacity of each party and the general equities of the situation. *Id.* Alimony is not a tool to equalize the parties' income, but a disparity of income or potential income might partially justify an alimony award. *Id.* The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances make it appropriate. *Id.*

In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or a just result. *Id.* The ultimate criterion is one of reasonableness. *Id.* An appellate court is not inclined to disturb the trial court's award of alimony unless it is patently unfair on the record. *Id.*

Here, on the record, the district court stated:

> I don't believe that alimony is appropriate in this case. He's able bodied, educated. There's nothing to suggest that he had given up any opportunities really to further his education, and some of his testimony at the trial is he's just not fulfilled with his life or not really that -- I don't think that meets the standard of what alimony is meant for. So his earning capacity is what will be used for the child support calculation, and I believe that was . . .
>
> . . . .
>
> Yeah, 5,704.40.

During the trial, the court heard testimony regarding Aaron's work history, his completion of a bachelor's degree program at the same undergraduate university as Heather, the approximate $40,000 already paid by Heather on the mortgage since the court's temporary order, that Aaron continued to work throughout Heather's pursuit of her veterinarian degree and following the opening of the clinic, and that Aaron transferred approximately $19,000 from the parties' joint accounts into his personal accounts following the parties' separation. Aaron argues that the court's failure to award him alimony in light of the evidence of the disparity in the parties' income, as well as the other factors, diminishes his contributions to the marriage and the business. We disagree.

The evidence showed that Aaron had obtained a bachelor's degree, that he had the ability to be and was gainfully employed, and that he did not have to disrupt his career or education due to Heather's employment or to care for the parties' children. Aaron testified that during most of the marriage, he was the primary "breadwinner," and that while he continued to work a full-time job, the parties jointly began setting up the veterinary clinic. It was undisputed that for a portion of time while Heather was completing the veterinary program, Aaron moved to Omaha for 18 months for work and the parties maintained two households during that time. Although Aaron struggled to maintain employment at times during the marriage, the positions he held included management and executive positions. Aaron testified that during the parties' marriage, he informed Heather that he wanted to further his education, that he was unfulfilled in his prior employment, and that he preferred to be a stay-at-home dad. Although Aaron testified that his career choices were unfulfilling and his mental health prevented him from obtaining employment, evidence showed that although Aaron was unemployed for a period of time following the parties' separation, Aaron began new employment as of March 2021 earning approximately $58,000 per year.

Although the record was unclear whether Aaron maintained that employment as of the time of trial, it is evident that Aaron had the ability to secure his own means of support. The primary purpose of alimony is to assist an ex-spouse for a period of time necessary for that individual to secure his or her own means of support. *Seemann v. Seemann*, 316 Neb. 671, 6 N.W.3d 502 (2024). When considering that Aaron had previously obtained employment and maintained the ability to continue employment, the amount of support Heather provided Aaron during the lengthy period following their separation, and the multiple factors associated with an allocation of a continuing support award, we do not find the court's decision not to award Aaron alimony as untenable or patently unfair on this record.

## 6. ATTORNEY FEES

Aaron next assigns that the district court erred in declining to award him attorney fees. He contends that Heather should be required to pay him $100,000 in attorney fees because "Heather out earns him six times over, and the behavior of her and her attorneys drove the cost of this divorce up." Brief for appellant at 33.

Attorney fees and expenses may be recovered only where provided for by statute or when a recognized and accepted uniform course of procedure has been to allow recovery of attorney fees. *Dycus v. Dycus*, 307 Neb. 426, 949 N.W.2d 357 (2020). A uniform course of procedure exists in Nebraska for the award of attorney fees in dissolution cases. *Id.*

In an action for dissolution of marriage, the award of attorney fees is discretionary. *Connolly v. Connolly*, 299 Neb. 103, 907 N.W.2d 693 (2018). We have said that in dissolution proceedings, an award of attorney fees depends on a variety of factors, including the amount of property and alimony awarded, the earning capacity of the parties, and the general equities of the situation. *Seivert v. Alli*, 309 Neb. 246, 959 N.W.2d 777 (2021). In dissolution cases, attorney fees may also be awarded to prevailing parties. *Id.*

Here, the district court stated on the record that

I'm not going to order any more [attorney] fees than already [have] been ordered, because . . . I don't think that any of the motions, although there were many for discovery, I think that once [Heather's subsequent counsel] got on the case, things were done in a timely manner. Objections were appropriate. Even if they weren't always ruled in your favor, I don't think there was any sort of . . . obstructive behavior on either side to warrant any additional [attorney] fees.

[Heather] was already assessed [attorney] fees from . . . her counsel's behavior prior to [new counsel] coming on the case, so outside of that order, each party is responsible for their own fees.

Aaron's argument generally relates to discovery issues prior to trial by Heather's prior counsel. The record indicates that the district court ordered Heather to pay $5,000 of Aaron's attorney fees prior to the trial with Heather also being ordered to pay $4,900 to Aaron as a result of her having to take the initial $5,000 out of the business's retained earnings. Further, during the approximately 4 years that this case was pending, Heather was ordered to pay the parties' mortgage which amounted to approximately $40,000 by the time of the trial. Although Aaron asserts that

- 13 -

the cause of the delays and discovery issues were Heather's prior counsel's fault, the record reveals that both parties engaged in behavior which contributed to the poor communication and cooperation throughout the case. It is apparent that both parties have substantial attorney fees in this case, and therefore we find that the district court did not err in ordering the parties to each pay their own attorney fees. See *Finley-Swanson v. Swanson*, 20 Neb. App. 316, 823 N.W.2d 697 (2012) (no abuse in ordering parties to pay their own attorney fees).

### 7. PROPOSED PARENTING PLAN AMENDMENTS

Aaron's seventh claim is that the district court erred in refusing to adopt his amendments to the parties' mediated parenting plan. He argues that during the trial, Heather testified that she did not oppose certain amendments to the parenting plan, the district court did not find that the amendments were not in the children's best interests, and therefore the district court should have included those amendments in the decree.

In the development of a parenting plan, consideration shall be given to the child's age, the child's developmental needs, and the child's perspective, as well as consideration of enhancing healthy relationships between the child and each party. Neb. Rev. Stat. § 43-2929(5) (Reissue 2016).

Prior to trial, the parties attended mediation and agreed to a parenting plan. However, during the trial, Aaron offered proposed amendments to the parties' mediated parenting plan consisting of 14 separate additional paragraphs. During cross-examination of Heather, Aaron's counsel went through the proposed amendments asking whether Heather would have any objections to including the amendments in the mediated parenting plan. Although Heather's counsel noted that attempting to obtain a settlement offer on the stand was inappropriate, Heather testified that she did not object to certain amendments, but did not agree with others.

The district court found that the parties' mediated parenting plan was in the minor children's best interests and specifically declined to adopt any of Aaron's proposed amendments. Although Aaron argues that Heather's agreement to some of the amendments warrants the court's adoption of Aaron's proposed changes to the parenting plan, the Nebraska Supreme Court has stated that

> whether parents come to court having agreed to a joint custody arrangement, or disputing the issues of custody and parenting time, the court is required to independently determine that any parenting plan being ordered is in the child's best interests and must reject or modify parenting plans that are not in the child's best interests or which do not meet the requirements of the Parenting Act.

*State on behalf of Kaaden S. v. Jeffery T.,* 303 Neb. 933, 955, 932 N.W.2d 692, 709 (2019).

We find that the district court did not err in declining to adopt any of Aaron's proposed amendments to the parenting plan regardless of whether Heather did or did not object to them during the trial. It was the district court's independent responsibility to determine whether the parenting plan or any of the proposed amendments were in the children's best interests. The district court found that the original stipulated parenting plan was in the minor children's best interests. Because Aaron has failed to identify why the plan adopted by the court was not in the children's

best interests, we reject Aaron's argument that Heather's failure to object to Aaron's proposed changes should have led to a different result. This assignment of error fails.

## 8. CHILD SUPPORT

Aaron next asserts that the district court erred in determining child support in two ways. First, Aaron contends that the district court erred in: (a) allowing Heather a credit for the health insurance premium and (b) not providing him with a retroactive upward adjustment based on the difference in Heather's income as determined in the temporary order and the final child support order.

### (a) Health Insurance Credit

Aaron asserts that the district court erred in allowing Heather a deduction for the cost of her insurance premium in calculating her child support obligation. Aaron alleges that the insurance premium reduces her taxable income, provides her with a deduction on her taxes, and therefore, it was improper for the district court to provide her with a deduction on the child support worksheet.

Under Neb. Ct. R. § 4-205 of the Nebraska Child Support Guidelines, in calculating a party's child support obligation, subsection F provides:

A deduction shall be allowed for the monthly out-of-pocket cost to the parent for that particular parent's health insurance. This includes the cost of coverage for the parent only. It does not include the cost of health insurance for the child(ren), which is addressed in § 4-215(A). The parent requesting the deduction must submit proof of the cost actually incurred for health insurance coverage of the parent. The amount of the deduction for the cost to the parent for health insurance for himself or herself shall not exceed 5 percent of that parent's gross income.

Aaron argues that since Heather receives a deduction on her personal tax returns for her health insurance premiums, she should not also receive a deduction for the health insurance premiums in calculating her child support obligation on the child support worksheet. However, Heather's personal tax return and the child support worksheets are two separate and distinct issues. In determining child support, § 4-205 clearly allows the district court to provide Heather a deduction for the health insurance premiums she pays in calculating her child support obligation. The Child Support Guidelines do not provide an exception if the insurance premium also serves as a taxable deduction in calculating taxable income. This assignment fails.

### (b) Retroactive Child Support Adjustment

Aaron argues that he should be awarded retroactive upward adjustment of temporary child support in 2020 and 2021 based on Heather's actual income. More specifically, he argues that the court's August 2019 temporary order awarded child support of $625 per month based upon its finding that Heather's gross monthly income was $14,593.50 and Aaron's monthly income was $5,000 whereas in its dissolution decree, the court ordered Heather to pay $1,311 per month in child support. This amount was based upon the court's finding that Heather's monthly income was $28,163 and Aaron's monthly income was $5,704. As we discuss in the next section, because we

find that the court erred in determining Heather's income, we need not consider Aaron's claim regarding whether the court should have retroactively upwardly adjusted Heather's temporary child support obligation. An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it. *Ronnfeldt Farms v. Arp*, 317 Neb. 690, 11 N.W.3d 371 (2024).

## 9. HEATHER'S CROSS-APPEAL

In her cross-appeal, Heather contends that the district court erred in calculating her income for the purposes of determining child support. More specifically, she contends that the district court erred in adding pass-through income of the business to the guaranteed payment to determine her annual income was $337,956.

The Nebraska Child Support Guidelines Neb. Ct. R. § 4-204 provides that in calculating the amount of support to be paid, a court must consider the total monthly income, defined as the income of both parties derived from all sources, except all means-tested public assistance benefits. Further, the guidelines provide that "a court may consider as income the retained earnings in a closely-held corporation of which a party is a shareholder if the earnings appear excessive or inappropriate. All income should be annualized and divided by 12." See Neb. Ct. R. § 4-204(A).

In determining Heather's income for purposes of the child support calculation, the district court stated, "I think that her income should be the 337,956. I don't think the business loan should be deducted from that amount, but I do think that pursuant to the Child Support Guidelines, she has to get credit for the health insurance."

In *Gangwish v. Gangwish*, 267 Neb. 901, 678 N.W.2d 503 (2004), the Nebraska Supreme Court addressed the calculation of a parties' income in situations where there is a closely held corporation. The court stated:

> We take a flexible approach in determining a person's "income" for purposes of child support, because child support proceedings are, despite the child support guidelines, equitable in nature. Thus, a court is allowed, for example, to add "in-kind" benefits derived from an employer or third party to a party's income. See, *Workman, supra*; *State on behalf of Hopkins v. Batt*, 253 Neb. 852, 573 N.W.2d 425 (1998); *Baratta v. Baratta*, 245 Neb. 103, 511 N.W.2d 104 (1994). Likewise, we believe that a party's income, for purposes of determining child support, does not necessarily stop at the corporate structure of a closely held corporation. Although, ordinarily, a corporation is regarded as a separate entity, distinct from the members who compose it, equity allows a court to disregard the corporate veil when necessary to do justice. See *Medlock v. Medlock*, 263 Neb. 666, 642 N.W.2d 113 (2002). As noted previously, "justice," in child support determinations, is the best interests of the child. *Claborn, supra*.

> Thus, we determine that under the appropriate factual circumstances, equity may require a trial court to calculate a party's income by looking through the legal structure of a closely held corporation of which the party is a shareholder. Stated otherwise, equity may demand that a court consider as income the earnings of a closely held corporation of which a party is a shareholder. The real question, however, is deciding what type of factual

scenario justifies casting aside the corporate identity to place corporate income on the shareholder's side of the ledger.

*Gangwish v. Gangwish*, 267 Neb. at 911-12, 678 N.W.2d at 513-14.

In *Harrison v. Harrison*, 28 Neb. App. 837, 859-60, 949 N.W.2d 369, 386-88 (2020), this court stated:

> As set forth in the Nebraska Child Support Guidelines, "a court may consider as income the retained earnings in a closely-held corporation of which a party is a shareholder if the earnings appear excessive or inappropriate." § 4-204. In *Guthard, supra*, we held that whether retained earnings are excessive or inappropriate necessarily implies that such earnings are not being retained for legitimate business purposes and could otherwise reasonably be expected to be distributed to a parent-shareholder for inclusion as income for child support purposes. A fact-specific inquiry is necessary to balance considerations that a well-managed corporation may be required to retain a portion of its earnings to maintain corporate operations and survive fluctuations in income, but corporate structures should not be used to shield available income that could and should serve as available sources of child support funds. *Id.* Relevant factors to weigh in determining what portion of undistributed corporate earnings may be available to a shareholder for child support purposes should include the following considerations: (1) the shareholder's level of control over the corporation's distributions—as measured by the shareholder's ownership interest, (2) the legitimate business interests justifying the retained corporate earnings, and (3) the corporation's history of retained earnings and distributions to determine whether there is any affirmative evidence of an attempt to shield income by means of retained earnings. *Id.*

Here, the district court, in calculating child support, found that Heather's income was not limited to her guaranteed payment of $140,998, but should include ordinary business income generated by the business in excess of guaranteed payments made to Heather in the amount of $222,680. We find that the district court abused its discretion when including the ordinary business income as part of her total income for purposes of calculating her child support obligation.

Although the district court is permitted in some situations to consider as income a businesses' retained earnings or business distributions when the business is being used to shield available income that could and should serve as available sources of child support funds, see *Harrison v. Harrison, supra*, we find no such character or conduct on this record. First, there was no testimony indicating that any of the businesses' retained earnings were inappropriate or excessive. In fact, Aaron's expert specifically refused to offer an opinion as to whether $96,000 in taxable income generated by the business in 2021 and retained in earning by the business was excessive. He testified that not only did he not have sufficient information to form a judgment on the excessiveness but testified that whether retained earnings were excessive depended on "what management's intentions are to do with the retained earnings."

As it relates to those intentions, the record reveals that as to the income generated by the business in excess of guaranteed payments made to Heather, a portion was annually distributed and utilized to pay the self-employment and income tax generated from these earnings for the

attributable year. In relation to those earnings, distributions made to shareholders to cover corporate tax liability should not be included as income for purposes of calculating child support. *Harrison v. Harrison*, 28 Neb. App. 837, 949 N.W.2d 369 (2020). In fact, Brad Yoder, Heather's CPA and tax professional, confirmed that, in 2021, the business distributions were utilized to pay Heather's tax liability and that, in 2021, the businesses' estimated tax liability was $128,266. Additionally, Yoder further testified that Heather also made distributions in order to pay the minimum monthly debt obligation on the business loan of approximately $11,734.97.

Taken together, Heather was primarily utilizing the income generated from the company to pay the allocable tax liability on the income generated and to cover the business' debt service and not to retain earnings to act as a shield against child support obligations. As such, on this record, we do not find a scenario where the income generated by the company was being retained for excessive or inappropriate reasons as opposed to being retained or distributed for legitimate business reasons. Accordingly, we find that the district court abused its discretion in calculating Heather's income for purposes of child support by utilizing the income generated by the business in addition to guaranteed payments made to Heather and remand the matter to the district court for the court to recalculate Heather's child support obligation based upon Heather's total income as indicated through her guaranteed payment obligations.

## VI. CONCLUSION

For the reasons stated above, we affirm in part and reverse and remand in part.

AFFIRMED IN PART, AND IN PART
REVERSED AND REMANDED.